9 So.2d 539

**STATE v. FARROBA et al.**

No. 36527.

March 2, 1942.

**On** Rehearing June 29, 1942.

Further Rehearing Denied July 20, 1942.

Eugene Stanley, Atty. Gen., Niels F. Hertz, Sp. Asst. Atty. Gen., L. O. Pecot, Dist. Atty., of Franklin, and Minos H. Armentor, Asst. Dist. Atty., of New Iberia, for the State.

H. W. Robinson, of New Orleans, for defendants and appellees.

O'NIELL, Chief Justice.

The five defendants were prosecuted under separate bills of information for catching salt-water shrimp in the waters of the

state without having resided in the state continuously for two years. The charge was brought under Section 4 of Act 50 of 1932, as amended by Section 3 of Act 314 of 1940. The case was triable by the judge, without a jury. Each of the defendants filed a demurrer, contending that the statute was unconstitutional in that it undertook to discriminate arbitrarily against a certain class of individuals, including the defendants, in violation of the provision in the 14th Amendment of the Constitution of the United States, forbidding any State to deny to any person within its jurisdiction the equal protection of the laws.

By agreement of the prosecuting attorney and the attorney for the defendants the five cases were consolidated and were tried and submitted together, on a stipulation of facts, reserving to the defendants the right to have the judge dispose of the demurrers before deciding the question of guilt or innocence. The judge maintained the demurrers, holding that the penal clauses in the 4th section of the statute, as amended by the 3rd section of Act 314 of 1940, violated the equal protection clause in the 14th Amendment of the Constitution of the United States. The state is appealing from the decision.

Section 4 of Act 50 of 1932, as originally enacted and as amended, makes it a penal offense for any nonresident of the state, or for any firm or association not composed of residents of the state, or for any corporation not domiciled in or incorporated under the laws of the state, to catch salt-water shrimp in the waters of the

state, or to can, pack or dry in any factory or on any platform in the state any salt-water shrimp taken from the waters of the state. Section 3 of Act 314 of 1940 added to Section 4 of the act of 1932 this definition of a resident of the state: "A resident of this State, for the purpose of this Act, is defined to be one who has had a continual [continuous] residence in the State of Louisiana for two years prior to taking, canning, packing or drying salt water shrimp and any person who was actually present and residing in the State on June 1, 1940." But for the words "any person", in the last clause in this definition, it would require that a person, in order to be a resident of the state within the meaning of the act, should have both qualifications; that is, he should have had a residence in the state for two years continuously, and should have been "actually present and residing in the State on June 1, 1940". Without these words "any person", the definition would read thus: "A resident of the State, for the purpose of this Act, is defined to be one who has had a contintual (continuous) residence in the State of Louisiana for two years prior to taking * * * salt-water shrimp and * * * who was actually present and residing in the State on June 1, 1940". But the attorneys all concede—as we understand—that the wording of the definition exempts two classes of persons from prosecution for catching salt-water shrimp in the waters of the state, namely, first, any person who has resided in the state continuously for two years prior to catching the shrimp,—even though he may not have been actually present or residing in

the state on June 1, 1940,—and, second, "any person who was actually present and residing in the State on June 1, 1940",—even though he may not have resided in the state continuously for two years prior to catching the shrimp. Accordingly, a non-resident, in the meaning of the statute, is a person who lacks both qualifications; that is, one who did not reside in the state continuously for two years prior to catching the shrimp and who was not actually present and residing in the state on June 1, 1940. Any person having either of these qualifications is a resident of the state, in the meaning of the statute, and is therefore allowed to catch salt-water shrimp in the waters of the state. That is how the judge of the district court construed the law, in the very able opinion which he rendered; and that is obviously its true meaning; otherwise no citizen of the state would be allowed to catch salt-water shrimp in the waters of the state—no matter how long he might have resided here—unless he was "actually present and residing in the State on June 1, 1940".

The evidence on which the case was submitted—reserving to each defendant the benefit of his demurrer—consists of admissions as to what the witnesses for the state would have sworn to if called to the witness stand. The purpose of the evidence was to show the status of each of the five defendants, with reference to his residence in or out of the state. Each defendant was the captain of one of five trawlers, moored at Patterson, in the Parish of St. Mary, where there is an establishment in which the shrimp are prepared for shipment.

It appears that the vessels some times landed in the basin on the gulf side of Franklin, the parish seat, where there is another establishment for preparing shrimp for shipment. The evidence shows that all of the defendants resided in the Parish of St. Mary, either in Franklin or in Patterson, continuously for a year or more previous to the date of the trawling, for which they are being prosecuted,—August 18, 1941. The boats left Patterson for the trawling grounds about August 12 and were trawling on August 18, 1941,—according to the bills of information. One of the defendants—Henry Farroba—rented an apartment in Franklin and moved into it on August 3, 1940. He moved out on February 10, 1941, but there is no evidence as to whether he remained elsewhere in Franklin, or went to Patterson, or was elsewhere in the state up to the date of the hearing of the evidence,—October 23, 1941. Ralph Johnson and his family moved into a rented apartment in Franklin on July 10, 1940, and they remained there continuously from that date to the date of the hearing of the evidence. Perry F. Smith and his wife moved into a rented apartment in Franklin on September 19, 1940. He came to Franklin some time before that date, but was not actually in the state on June 1, 1940, because he was then on his vessel, on the Gulf, en route from Florida to Franklin, where he arrived only a few days after the 1st day of June. He and his family resided in Franklin continuously from the date of his arrival in the early part of June, up to the date of the hearing of the evidence. Carlos Pinho rented an apartment in Franklin on June

14, 1940, and he and his wife and four children moved into the apartment on July 19, 1940. He had resided in this State, in Jefferson Parish, where he was employed by an oil company, from the latter part of 1937 until some time in 1938. He and his family moved to Florida in 1938 and returned to Louisiana in April, 1940; that was a year and four months before he did the trawling, for which he is being prosecuted. A few days before the first day of June, 1940, he went to Florida to bring a boat to Franklin, Louisiana, and was on the boat, on the gulf, en route to Franklin, on June 1, 1940. He arrived in Franklin a few days after the 1st of June. From that time up to the date of the hearing of the evidence he and his family resided continuously in Franklin, where his children attended school.

Section 4 of Act 50 of 1932, before it was amended by the Act of 1940, merely made it unlawful for any person not a resident of the state, or for any firm or association not composed of residents of the state, or for any corporation not domiciled in or incorporated under the laws of this state, to catch salt-water shrimp in the waters of the state, or to can, pack or dry in any factory or on any platform in the state, any salt-water shrimp taken from the waters of the state. All residents of the state were treated alike, regardless of their time or term of residence in the state. It was permissible, of course, for the Legislature to discriminate—as it did discriminate in the act of 1932—between residents and nonresidents of the state, by permitting the residents and forbidding the

nonresidents to catch salt-water shrimp in the waters of the state. A state has the right to enact laws making the fish and game, called wild life, the property of the state, and to conserve such natural resources for the exclusive benefit of the residents of the state. A state statute that permits the residents and forbids all nonresidents of the state to fish in the waters of the state does not thereby deny to any person the equal protection of the laws, in the meaning of the equal protection clause in the Federal Constitution; nor does such a statute conflict with the provision in the Federal Constitution that the citizens of each state shall be entitled to all the privileges and immunities of the citizens in the several states. Haavik v. Alaska Packers' Association, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414. See, also, McCready v. Virginia, 94 U.S. 391, 24 L.Ed. 248, and Patsone v. Com. of Pennsylvania, 232 U.S. 138, 34 S.Ct. 281, 58 L.Ed. 539. But any classification of persons, made in a statute, for the purpose of distinguishing between or among the classes so created, must be a reasonable classification, founded upon a real distinction, which must have a fair and substantial relation to the object sought to be accomplished by the statute. Gulf, Colorado & Santa Fe Railway Co. v. Ellis, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666; Cotting v. Godard, 183 U.S. 79, 22 S.Ct. 30, 46 L.Ed. 92; Southern Railway Co. v. Greene, 216 U.S. 400, 30 S.Ct. 287, 54 L. Ed. 536, 17 Ann.Cas. 1247; Atchison, Topeka & Santa Fe Railway Co. v. Vosburg, 238 U.S. 56, 35 S.Ct. 675, 676, 59 L.Ed. 1119, L.R.A.1915E, 953. In the latter case

the court said, of the equal-protection clause:

"It does not prevent classification, but does require that classification shall be reasonable, not arbitrary, and that it shall rest upon distinctions having a fair and substantial relation to the object sought to be accomplished by the legislation."

The object sought to be accomplished by Act 50 of 1932 is declared in its title to be to encourage, protect, conserve, regulate and develop the shrimp industry of the state. We cannot imagine how the distinction which is made in the act of 1940,—by allowing all persons who were actually present and residing in the state on June 1, 1940, to catch salt-water shrimp in the waters of the state, and by making it a crime for any other resident of the state, who has not resided here continuously for two years, to catch salt-water shrimp in the waters of the state,—can have a fair and substantial relation to the object sought to be accomplished by this legislation. There was no suggestion in the argument and there is none in the brief for the state as to the purpose of this discrimination in the statute; and the judge of the district court in his written opinion informs us that he was not given any information on the subject. The residents of the state who were engaged in the shrimp industry but who had not resided in the state continuously for two years were not given any warning that they should be actually present and residing in the state on June 1, 1940, in order to protect themselves against prosecution for continuing in their occupation. That date had passed, not only when the

law went into effect, but even when the bill was introduced in the Legislature. The bill was read by title on June 23 and was finally passed and sent to the Governor for executive approval on July 10, 1940, according to the House Calendar, p. 420. The act was approved by the Governor on July 19, and, according to Section 27 of Article III of the Constitution, See Act No. 384 of 1940, it went into effect on July 31, 1940,—that day being the twentieth day after the Legislature adjourned.

It is argued in the brief for the state that it may be assumed, for the sake of argument, that the provision in the statute which exempts from prosecution "any person who was actually present and residing in the State on June 1, 1940," is unconstitutional, without denying to the state her right to prosecute a person for catching salt-water shrimp in the waters of the state without having resided in the state continuously for two years before catching the shrimp. It is argued also in the state's brief that there are two ways in which to violate the statute,—namely, first, by catching salt-water shrimp in the waters of the state without having been actually present and residing in the state on June 1, 1940, and, second, by catching salt-water shrimp in the waters of the state without having resided in the state continuously for two years before catching the shrimp. But it is obvious that an indictment charging that a person caught salt-water shrimp in the waters of the state without having been actually present and residing in the state on June 1, 1940, would not accuse him of violating the statute, unless it is alleged al-

so in the indictment that the person accused did not reside in the state continuously for two years before catching the shrimp. In the same way, an indictment charging that a person caught salt-water shrimp in the waters of the state without having resided in the state continuously for two years before catching the shrimp would not accuse him of violating the statute, unless it is alleged also in the indictment that the person accused was not actually present and residing in the state on June 1, 1940. The bills of information in this instance were defective in that they charged merely that the parties accused caught the salt-water shrimp in the waters of the state without having resided in the state continuously for two years before catching the shrimp, but did not charge that the parties accused were not actually present and residing in the state on June 1, 1940. The defendants might have demurred on that ground if they had not preferred to have a stipulation of facts on the subject, and to plead that the penal clauses in the statute were unconstitutional. Our conclusion is that the judge of the district court was right in adjudging the penal clauses in the statute unconstitutional.

The judgment is affirmed.

ODOM, J., takes no part.

HIGGINS, J., concurs in the decree.

FOURNET, J., dissents.

McCALEB, J., dissents with reasons.

McCALEB, Justice (dissenting).

I cannot agree that the statute involved in this case is unconstitutional in that it arbitrarily discriminates against persons who were not actually present and residing in this State on June 1, 1940, or who have not resided continuously in the State for two years by prohibiting them from catching salt-water shrimp in the waters of the State. The purpose for which the statute was passed was to encourage, protect, conserve, regulate and develop the shrimp industry and to provide the manner and extent by which shrimp may be reduced to private ownership. In furtherance of this object, the Legislature provided, in substance, that permission to take salt-water shrimp from the waters of this State is limited to persons who are residents of the State,—and, for the purposes of the Act, residents are declared to be either persons who have had continuous residence in the State for two years prior to the taking of the shrimp or those who were actually present and residing in the State on June 1, 1940. I cannot see anything unreasonable about this classification. Surely, the provision that it is necessary that a person be a resident of the State for two years prior to the taking of the shrimp is not arbitrary but is founded upon the underlying object of the legislation to permit the people of Louisiana to enjoy privileges not extended to non-residents. The fact that the statute also provides that persons residing in the State on June 1, 1940, will be considered as residents, notwithstanding that they may not have resided continuously in the State for two years previous to the taking of the shrimp, merely

evidences a desire on the part of the Legislature not to exclude those persons who were actually residing in the State at that time from the advantages and privileges of the grant. Far from being arbitrary, it strikes me that this provision is most reasonable.

It is true that the statute defines a resident as "any person who was actually present and residing in the State on June 1, 1940". The word "present" should not be narrowly interpreted to mean that the person must have been physically present in the State on that day for it seems clear that the Legislature had in mind that if a person was a bona fide resident of the State on June 1, 1940, he would be entitled to the privileges granted under the Act.

Moreover, I cannot comprehend that the fact that persons who were engaged in the shrimp industry did not have notice of the introduction of the bill (Act 314 of 1940) has anything to do with its constitutionality. Nor can I see that the fact that the bill was not read by title until June 23, 1940, and was not finally passed until July 10, 1940, strengthens the position of the majority that the date June 1, 1940, was arbitrarily fixed by the Legislature.

The date, June 1, 1940, which, for the purpose of the Act, is declared to be the test in determining whether a person is a resident of the State, rests upon a distinction having a fair and substantial relation to the object sought to be accomplished by the Legislature. It must be borne in mind that the Legislature evidenced a purpose in the passage of the Act of prohibiting all non-

residents of this State from taking from the waters of the State the salt-water shrimp. In order to accomplish this object, it was deemed necessary to define who was a resident of the State. The date June 1, 1940, was designedly selected because that date had passed and the resident fishermen had already established themselves as such. In other words, the Legislature saw fit to select a date in the past rather than one in the future in order to limit the privilege to catch shrimp to persons who were then (at or about the time the bill was introduced in the House) bona fide residents of the State. If some date in the future had been designated it would have been possible for non-resident fishermen to come into the State prior to that date and obtain the privileges which were set aside for those who had already acquired the status of bona fide residents.

The Legislature, in its wisdom, sought to avoid this possibility and I cannot see that its action in so doing was unwarranted, unreasonable or arbitrary.

For these reasons, I respectfully dissent from the majority opinion.

## On Rehearing.

HIGGINS, Justice.

The five accused were charged in separate bills of information filed on October 20, 1941, in the 16th Judicial District Court for the Parish of St. Mary, this State, with having on August 18, 1941, unlawfully caught "salt water shrimp in the waters of this State not having had a continuous residence in the State of Louisiana for two years pri-

or to such taking contrary to the form and statute, * * *."

The defendants filed an exception to the jurisdiction of the court on the ground that the venue of the alleged offense was outside of the territorial limits of the Parish of St. Mary. They also filed demurrers on the grounds: First, that the bills of information failed to set forth any offense under the laws of this State and that, if such an offense was charged, it was cognizable only in the federal courts, having been committed on the high seas; Second, that the statute under which the defendants were charged only applied to individuals or corporations engaged in fishing, canning, or drying shrimp, and did not include the employees of such persons or corporations; and, third, that Sections 3 and 4 of Act 314 of 1940, which they were charged with violating, were unconstitutional, being contrary to the provisions of Sections 2 and 9 of Article 1 of the State Constitution of 1921 and the Fifth and Fourteenth Amendments to the Federal Constitution.

The cases were consolidated for trial, upon an agreed statement of facts.

The learned trial judge, in one judgment, overruled the exception to the jurisdiction but maintained the plea of unconstitutionality of Section 3 of the statute and discharged the defendants. Only the State appealed.

This court, in its original opinion, affirmed the judgment of the district court holding that Section 3 of the statute was unconstitutional but did not pass upon the plea to the jurisdiction of the court. The State applied for a rehearing, which was granted, and the case was reargued and submitted.

■ It is clear that unless the venue of the alleged crime was within the boundaries of the Parish of St. Mary, the district court was without territorial jurisdiction to consider the case and, therefore, was lacking in power and authority to decide the other issues in the case and particularly those on the merits. The first question to be decided is whether or not the district judge was correct in maintaining jurisdiction.

■ The point made by the State that the above issue is not before this court because the defendants did not either except to the judgment overruling the plea to the jurisdiction or appeal therefrom is without merit, as the error complained of by the defendants, if any, is patent on the face of the record.

The relevant part of Section IX of Article 1 of the Constitution of the State of Louisiana of 1921 reads:

"* * * provided further, that all trials shall take place in the parish in which the offense was committed, unless the venue be changed; provided further, that the Legislature may provide for the venue and prosecution of offenses committed within one hundred feet of the boundary line of a parish. * * *" (Article 13 of the Code of Criminal Procedure contains this identical provision.)

In the case of State v. Nugent, 191 La. 198, at page 200, 184 So. 746, 747, this court said:

"Under the provisions of Section 9 of the Bill of Rights of the Constitution of 1921

a person accused of a crime has the right to have a plea to the territorial jurisdiction of the trial court passed on by the trial judge before being put on trial for the alleged offense. This provision of the Constitution not only guarantees the defendant that he shall not be convicted in any other parish than that in which the offense was committed but guarantees that he shall not be tried in any other parish. This identical question was decided in the case of State v. Hogan, 157 La. 287, 102 So. 403, wherein this Court, after reviewing all the prior decisions on this subject matter, concluded that the defendant is as a matter of right entitled *to have his plea to the territorial jurisdiction of the court decided before being placed on trial for the offense.*" (Italics ours.)

When Spain ceded Louisiana to France, the southern boundary of what is now the State of Louisiana was described as the shore of the Gulf of Mexico. In 1803, when Louisiana was purchased from France, the southern limit was declared to be the shore of the Gulf of Mexico. In 1812, when the State of Louisiana adopted its first Constitution, the introductory part thereof described the State's boundaries as "beginning at the mouth of the river Sabine, thence by a line to be drawn along the middle of said river, including all its islands, to the thirty second degree of latitude—thence due north to the Northernmost part of the thirty third degree of north latitude—thence along the said parallel of latitude to the river Mississippi—thence down the said river to the river Iberville, and from thence along the middle of the said river and lakes Maurepas

and Pontchartrain *to the Gulf of Mexico— thence bounded by the said Gulf to the place of beginning, including all Islands within three leagues of the coast.*" (Italics ours.)

In U. S. Statute, Public Act of Congress, Feb. 20, 1811, 2 Stat. 641, admitting Louisiana to statehood in the Union, the same description appears, and it will be noted that the southern boundary of the State was fixed as the Gulf of Mexico and the islands within three leagues of the coast.

In 1811, Attakapas County was divided into St. Mary and St. Martin Parishes by Act No. 24. The upper part of this territory constituted St. Martin Parish and the lower part, St. Mary Parish. The Act of March 20, 1813, described the boundary of St. Mary Parish, as follows:

"Sec. 1. Be it enacted by the Senate, House of Representatives of the State of Louisiana in General Assembly convened That a straight line to be run from the westwardly corner of the upper line of the plantation of Francis Boutte where he now lives, to the head of the canal, leading to the Petite Anse Island, thence down the canal to the Petite Anse Bayou and down the same to the bay commonly called the Vermillion Bay; thence southeasterly with the bay and the line of the State, to the entrance into the Bayou Teche, thence up the Bay of the same to include all the settlements on the Bayou that intersect with the bay on the east side what is commonly called Berwick's Bay and not included in either of the Parishes of the Lafourche, then up the middle of the Grand Lake to the place where a line running east from the aforesaid Francis Bout-

te's plantation shall strike the said Lake, shall belong to the Parish of St. Mary."

The General Assembly of the State of Louisiana, by Act 208 of 1868, created Iberia Parish out of a portion of St. Martin and a portion of St. Mary Parishes and the coast of the Gulf of Mexico formed the southern boundary line of the new parish. The southern limits of the Parishes of Terrebonne, created by Act of 1822 shown on page 74 thereof, Vermillion, created by Act 81 of 1844, and Cameron, created by Act 102 of 1870, were fixed in the descriptions thereof as the shores of the Gulf of Mexico.

The only statement in the record with reference to the place where the alleged offense took place reads as follows:

"It is further agreed that these defendants in the above named and numbered boats proceeded down the Atchafalaya River and when reaching the bay and gulf were seen by witnesses who are present, and who will testify to the fact that they were trawling for shrimp in five (5) or six (6) fathoms of water from the position of the waters directly west of the Atchafalaya River between that point and Marsh Island, the distance from the shore line of the Parish of St. Mary, due South to the eastern end of the Marsh line *being estimated* at twenty-five (25) miles." (Italics ours.)

There was introduced in evidence a map of the State of Louisiana showing the respective boundary lines of the above-named Parishes, the Atchafalaya River, the Atchafalaya Bay, the Gulf of Mexico, and Marsh Island. From this map, it clearly appears that the boundary lines of the respective parishes are irregular and that the shore line boundaries of Terrebonne, Iberia and St. Mary Parishes along the Gulf of Mexico are also irregular. The boundary line between Iberia and St. Mary Parish, as appears from the map, is curved around the east side of Marsh Island, which is in Iberia Parish.

The State contended, and this view was adopted by the trial judge, that under the provisions of Act 55 of 1938, the southern boundary of the State of Louisiana had been extended out into the Gulf of Mexico twenty-four marine miles, from the three mile limit, or twenty-seven miles from shore, and that the territorial limits of the parishes bordering on the shores of the Gulf of Mexico had likewise, by operation of this law, been so extended, and, as the offense had taken place about twenty-five miles from the shore, the venue of the crime was in the Parish of St. Mary and the court had territorial jurisdiction.

Section 1 of Act 55 of 1938 provides that "the gulfward boundary of the State of Louisiana, is hereby fixed and declared to be a line located in the Gulf of Mexico parallel to the three-mile limit as determined according to said ancient principles of international law, which gulfward boundary is located twenty-four marine miles further out in the Gulf of Mexico than the said three-mile limit."

In Section 3 of the Act it is stated that the State of Louisiana owns all of the waters of the Gulf of Mexico and its arms, either at low or high tide." * * * with-

in the boundaries of Louisiana, as herein fixed."

A reading of the provisions of Act 55 of 1938 reveals that nothing is said in the statute about extending the boundaries of any of the parishes bordering on the Gulf of Mexico or conferring jurisdiction upon the respective courts of the districts within which those parishes are located. Counsel for the defendants challenge the constitutionality of Act 55 of 1938, if it is interpreted as the State contends, because it would be enlarging the territorial jurisdiction of the district courts without an amendment to the Constitution.

Assuming that the statute is constitutional and that it impliedly extends the boundaries of those parishes bordering on the Gulf of Mexico the additional twenty-four marine miles into the Gulf, a view most favorable to the State, but without deciding either of those issues, it appears to us that the State is confronted with an insuperable barrier because neither from the record nor from the law can the location of the alleged offense be fixed with any certainty as coming within the territorial limits of the Parish of St. Mary. To begin with, the record shows that the distance the defendants were fishing from the shore line was merely "estimated" at twenty-five miles. This in itself leaves the exact place where the alleged offense happened doubtful. It might well be that the parties were more than twenty-seven miles from the shore. But, even if they were within the twenty-seven mile limit, when the court would attempt, without legislative guide and without surveys, to extend the parish lines separating the respective parishes bordering on the Gulf of Mexico, it would be confronted with a most confusing, if not inexplicable, problem. The shore line of the Gulf of Mexico forming the border of the parishes located along its shores, and particularly Terrebonne, Iberia and St. Mary Parishes, is very irregular. The border line between the two latter parishes is also irregular. The question thus arises—just how and where would you extend the boundary lines of these parishes into the Gulf of Mexico. Would the lines be merely continued out into the Gulf in the direction in which they were last pointed? Would they be extended on right angles to the shore, if it were possible to strike a line with the shore so as to make such an extension of the boundary line? Just where these extended boundary lines would lead to or converge, from the information in this record and the provisions of the statute (Act 55 of 1938), is utterly impossible to determine. Thus, we could not say with the slightest confidence that the violation of the law with which the defendants were charged occurred within the territorial limits of the Parish of St. Mary. As it appears from the face of the record that the venue of this alleged violation of the law was not in the Parish of St. Mary, the district court was without territorial jurisdiction to entertain and decide the case.

For the reasons assigned, it is ordered, adjudged and decreed that the plea to the territorial jurisdiction of the court is sustained; and the defendants are discharged. The right to petition the court for a re-

hearing is reserved to the State of Louisiana.

O'NIELL, C. J., dissents from the ruling on the question of venue and adheres to his original opinion that the penal clauses in the statute are unconstitutional, and hands down reasons.

O'NIELL, Chief Justice (dissenting).

There are several reasons why I did not refer to the question of venue in the original opinion which I wrote for the court in this case. In the first place, the question was not tendered as a preliminary exception to the jurisdiction of the court, or before the trial of the case on its merits, but was presented during the progress of the trial and was dealt with as a matter of defense. In fact the judge's decision on the question was not even excepted to. In the second place, the question whether the alleged offense of catching salt-water shrimp in the waters of the state was committed inside of the Parish of St. Mary or south of the border, was a question of fact, and the judge's finding of fact seems to have been supported by the admission made on the trial of the case, in the stipulation of facts. The admission was dictated by the district attorney, and is copied in the prevailing opinion in this case. The admission was that the place where the defendants were seen trawling for shrimp was "directly west of the Atchafalaya River between that point and Marsh Island." The official map introduced in evidence in this case—and in fact every official map of the coast line

of the State of Louisiana—shows that the southern boundary of the Parish of St. Mary extends all the way from the mouth of the Atchafalaya River to and beyond Marsh Island. Therefore, trawling for salt-water shrimp "in the waters of this state" anywhere between the mouth of the Atchafalaya River and Marsh Island is within the Parish of St. Mary. There is no other shore line between the Atchafalaya River and Marsh Island but the shore line of the Parish of St. Mary. Hence if the trawling for shrimp in this case, between the Atchafalaya River and Marsh Island, was not within the Parish of St. Mary it was not within the territorial limits of the state, and the statute which purports to make it a crime to catch "salt-water shrimp in the waters of this state" would be extraterritorial legislation, and beyond the authority of the Legislature to enact such a law.

It is true that the admission which is copied in the prevailing opinion in this case, from the stipulation of facts on which the case was submitted to the judge for his decision, ends with the statement that "the distance from the shore line of the Parish of St. Mary, due South to the eastern end of the Marsh line being estimated at twenty-five (25) miles." The phrase "the eastern end of the Marsh line" obviously means "the eastern end of Marsh Island". There is no "Marsh line" anywhere due south from the shore line of the Parish of St. Mary except on Marsh Island; and so, the phrase "eastern end of the Marsh line" cannot mean anything but the eastern end of Marsh Island. But

whether the district attorney in his dictating said "eastern end of Marsh Island", or said "eastern end of the Marsh line" is a matter of no importance. The important fact is that the distance from the shore line of the Parish of St. Mary to the eastern end of Marsh Island is not twenty-five miles but only four and one-half miles; and therefore the distance from the shore line of the Parish of St. Mary, due south, to a vessel traveling between the mouth of the Atchafalaya River and Marsh Island would never be much further than four and one-half miles. The scale on which the official map in evidence in this case was drawn is printed on the southwest corner of the map and shows that one inch equals three miles. The scale on which the official map in the office of the State Board of Engineers was drawn is one-sixth of an inch to the mile. According to either map, Marsh Island is located in the admission in this case, nearly twenty miles farther south from the shore line of St. Mary Parish than it really is, as shown on the official maps. The east end of Marsh Island is almost due south— slightly west of due south—from Point Marone, which is on the shore line of St. Mary Parish. The greatest distance, measured due south, from the shore line of St. Mary Parish to the east end of Marsh Island is only 10½ miles. The location of the place where the defendants were seen "trawling for shrimp",—according to the stipulation that is copied in the prevailing opinion in this case,—was "directly west of the Atchafalaya River between that point and Marsh Island". A vessel trawling over that route would not be as far as three leagues from the shore line, or beyond the waters of the state; and as long as she would be within the waters of the state she would be in the Parish of St. Mary; because the east boundary of the Parish of St. Mary—as shown on the official map in evidence in this case—extends southward along the west boundary line of Terrebonne Parish, to Point au Fer, a distance exceeding 13 miles south from the mouth of the Atchafalaya River; and Marsh Island is in the Parish of Iberia, notwithstanding it lies south of the · shore line of the Parish of St. Mary.

The Legislature could not have included Marsh Island in the Parish of Iberia, as it did by Act 208 of 1868, if the island had not been above the southern boundary of the state. It is pointed out in the prevailing opinion, as a matter of history, that the southern boundary of Louisiana, on the Gulf of Mexico, includes "all Islands within three leagues of the coast." That description, of course, includes Marsh Island, because in English-speaking countries the measure of distance called a "league" is estimated at three miles,—the nautical league measuring in fact 3.45 miles. See Webster's New International Dictionary, verbo League. See, also, Lipscomb, Sheriff, v. Gialourakis, 101 Fla. 1130, 133 So. 104. The southern boundary line of the Parish of St. Mary therefore, on the basis of three miles to the league, extends 9 miles out from the shore line into the gulf, and on the basis of 3.45 miles to the league, it extends 10.35 miles from the shore line out into the gulf or bay. It is certain therefore

that when the defendants were trawling for shrimp between a point near the mouth of the Atchafalaya River and Marsh Island, they were within the boundaries of the Parish of St. Mary. Otherwise they would have been outside the state itself. The map shows that they were in or close beyond Atchafalaya Bay when they commenced trawling,—according to the stipulation of facts.

The judge of the district court did not rest his decision of the question of venue upon the validity of Act 55 of 1938, purporting to extend the state's "gulfward boundary 24 miles farther into the Gulf of Mexico." On the contrary, after referring to Act 55 of 1938, the judge said, in his written opinion in this case: "But, irrespective of this legislative enactment, the boundaries of all parishes which adjoin the Gulf of Mexico extend as far south into the gulf as the state boundary." The judge then quoted from Lipscomb, Sheriff, v. Gialourakis, 101 Fla. 1130, 133 So. 104, 107, thus: "The words 'To the Gulf of Mexico' will be construed to mean to the boundary line of the state of Florida in the Gulf of Mexico."

In Lipscomb, Sheriff, v. Gialourakis, which was a prosecution for violating a criminal statute forbidding the use of diving suits, helmets and other deep-sea diving apparatus in the taking of commercial sponges from the Gulf of Mexico within the territorial limits of the State of Florida, one of the defenses urged against the indictment was "that the offense was not committed within the jurisdiction of Taylor county". That was the county in which the grand jury indicted the defendant. He contended that the state could not prove that the alleged violation of the statute, by the use of deep-sea diving equipment, within the territorial limits of the state, out in the Gulf of Mexico, occurred in Taylor county. In response to that plea the Supreme Court of Florida said that all of the bottoms of the Gulf and natural bays within the limits of the State of Florida passed to the state in its sovereign capacity when Florida was admitted into the Union. The court then quoted from the Constitution of Florida the boundaries of the state, which quotation ended thus: "thence northeastwardly to a point three leagues from the mainland; thence northwestwardly three leagues from the land to a point west of the mouth of the Perdido river; thence to the place of beginning." Article V. The court then quoting section 1 of article 8 of the Constitution of Florida, proceeded, thus:

"The State shall be divided into political divisions to be called counties."

"It therefore appears that all of the state of Florida was required to be divided into counties, and therefore it must be construed that counties bordering on the Gulf of Mexico include that area within the gulf adjacent to the upland and out to the state boundary line."

The Supreme Court of Florida then applied the rule pertaining to conveyances of land bordering on navigable waters "with riparian rights connected therewith", the rule being that the lines fixing the riparian rights should be drawn at

right angles from the shore line. The court then quoted the statute defining the boundaries of Taylor county, concluding thus: "thence down the western boundary of Lafayette county to the Gulf of Mexico; thence along said Gulf to the mouth of the Aucilla river." And here the court added:

"The words 'To the Gulf of Mexico' will be construed to mean to the boundary line of the state of Florida in the Gulf of Mexico."

Finally the court said:

"The state may enforce its sovereign powers and rights through its courts, and for this purpose the courts of the state have jurisdiction over such areas, and the circuit court of Taylor county has jurisdiction to enforce the sovereign rights of the state over that portion of the Gulf of Mexico lying between the shore of the gulf and the state line three leagues distant from the shore and between lines drawn at right angles from the shore line from the mouth of the Aucilla river to the state boundary line and the line drawn at right angles from the shore line from where the western boundary line of Lafayette county touches the waters of the gulf to the state boundary line."

In the present case there is no necessity for adopting a rule for finding the direction in which the side lines of the Parish of St. Mary should be extended to the state line, three leagues south from the shore line of the parish. The reason for this is that the admission made on the trial of this case shows that the trawling,

for which the defendants are being prosecuted, was done at a location less than three leagues distant from the southern shore line of the parish, and between the eastern and western boundaries of the parish.

Another interesting decision on this subject was rendered by the Supreme Court of Florida in the case of Skiriotes v. State of Florida, 144 Fla. 220, 197 So. 736, and was affirmed by the Supreme Court of the United States in Skiriotes v. State of Florida, 313 U.S. 69, 61 S.Ct. 924, 930, 85 L.Ed. 1193. The defendant in that case also was prosecuted for violating the statute forbidding the using of deep-sea equipment in the taking of sponges from the Gulf of Mexico off the coast of Florida. The venue of the offense was said to be in the County of Pinellas within 3 marine leagues (said to be 9 nautical miles) from the shore line. Chief Justice Hughes, for the Supreme Court of the United States, said that the question was whether the statute, as applied to persons who were subject to the jurisdiction of Florida was beyond the competency of the state; and he answered that the court had not been referred to any act of Congress with which the state statute conflicted. The Chief Justice concluded by saying that Florida had an interest in the proper maintenance of the sponge fishery and that the statute so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, was within the police power of the state. He said that there was no repugnance in the provisions of the statute to the equal protection clause of the Fourteenth

Amendment, because the statute applied equally to all persons within the jurisdiction of the state. The appellant contended that the state had transcended its power by applying the statute to his operations outside the territorial waters of Florida. The Chief Justice went so far as to say that the State of Florida might govern the conduct of its citizens upon the high seas with respect to matters in which the state had a legitimate interest, where there was no conflict with acts of Congress. And the Chief Justice concluded his decision thus:

"We are not unmindful of the fact that the statutory prohibition refers to the 'Gulf of Mexico, or the Straits of Florida or other waters within the territorial limits of the State of Florida'. But we are dealing with the question of the validity of the statute as applied to appellant from the standpoint of state power. The State has applied it to appellant at the place of his operations and if the State had power to prohibit the described conduct of its citizen at that place we are not concerned from the standpoint of the Federal Constitution with the ruling of the state court as to the extent of territorial waters. The question before us must be considered in the light of the total power the State possesses (Castillo v. McConnico, 168 U.S. 674, 684, 18 S.Ct. 229, 233, 42 L.Ed. 622, [626]; Hebert v. [State of] Louisiana, 272 U.S. 312, 316, 47 S.Ct. 103, 104, 71 L. Ed. 270, 272, 48 A.L.R. 1102; United Gas [Pub. Serv.] Co. v. [State of] Texas, 303 U.S. 123, 142, [625], 58 S.Ct. 483, 492, 82 L.Ed. 702 [716]), and so considered we find no ground for holding that the action of the State with respect to appellant transcended the limits of that power."

I do not subscribe to the opinion that the district court in and for the Parish of St. Mary was without jurisdiction to decide this case. Section 9 of article 1 of the Constitution provides that all trials of criminal cases shall take place in the parish in which the offense was committed, unless the venue be changed. The defendant in a criminal prosecution may waive his right to avoid being put on trial in the wrong parish, by reserving the question of venue, to be decided by the judge or jury, as the case may be, on the trial of the case on its merits. That is what the defendants did in this case. The record shows that, during the progress of the trial, on a stipulation of facts, as soon as the district attorney dictated the admission as to where the trawling was done by the defendants, their attorney asked permission to file an exception to the jurisdiction of the court, based upon the section of Article 1 of the Constitution which insured to an accused person the right to be charged in the parish in which the offense was committed. It was agreed that this exception would be argued after the completion of the stipulation of facts. The decisions cited in the majority opinion, State v. Nugent, 191 La. 198, 200, 184 So. 746, and State v. Hogan, 157 La. 287, 102 So. 403, and the case of State v. Moore, 140 La. 281, 72 So. 965, and all other cases in which it has been held that the constitutional guaranty protects a defendant not only against being convicted but also

against being tried in any parish other than that in which the offense was committed, were cases in which the defendant filed his plea and prosecuted it to a finish before the beginning of the trial of the case on its merits. The question of venue was not tendered before the trial of this case.

I do not concur in the opinion that the alleged error of the trial judge, in deciding that the trawling for which the defendants are being prosecuted was done within the territorial limits of the Parish of St. Mary, "is patent on the face of the record". In the first place I do not find that the judge's decision on that subject was an error; and in the second place an error is never said to be patent on the face of the record if it requires an examination of the evidence to decide whether it is an error.

The question of location of the boundary line of a parish is a question of law, but the question whether an alleged crime was committed on the one side or the other side of the established boundary line is a question of fact. State v. Burton, 106 La. 732, 31 So. 291; and State v. Malone, 133 La. 56, 62 So. 350. In State v. Moore, 140 La. 281, 72 So. 965, it was said that, even in cases where the question whether the alleged offense was committed in the parish in which the prosecution was instituted was merely a question of fact, the question did not relate directly to the question of guilt or innocence of the person accused, and that, *"when such questions are properly presented,* in a criminal prosecution," the Supreme Court has jurisdiction to decide the questions. (The italics are mine). Conceding, for the sake of argument, that the question of venue in this case is presented so as to give this court jurisdiction to decide the question, it is mainly if not entirely a question of fact; and on such questions we defer largely to the judgment of the judge who tried the case.

It is a matter of common knowledge that the large trawlers sometimes go very far into the gulf—perhaps forty or fifty miles from the shore line—in their trawling for large shrimp. When a vessel is trawling for shrimp beyond the boundary line of the state she is not violating the statute,— Section 4 of Act 50 of 1932 as amended by Section 3 of Act 314 of 1940,—which forbids catching salt-water shrimp "in waters of this State". Whether the trawling with which the defendants were charged in this case was done within or beyond the waters of the state is therefore a question of fact on which depends their guilt or innocence. The conclusion of the trial judge on that question must have been founded entirely upon the admission made in the stipulation of facts; because, as stated in the prevailing opinion in this case, "The only statement in the record with reference to the place where the alleged offense took place" is the admission in the stipulations of facts, copied in the prevailing opinion.

I concede that the question of venue— or the determination of the parish in which a crime was committed—if committed on the gulf and within three leagues from the shore line—might present a difficult or

even impossible problem in some cases. For that reason, perhaps section 9 of Article I of the Constitution, so far as it requires "that all trials shall take place in the parish in which the offense was committed, unless the venue be changed", ought to be amended so as to provide for fixing the venue of offenses committed on the waters of the gulf, within three leagues from the shore line. But that requirement in the Constitution does not cause any difficulty in this case.

I respectfully adhere to my original opinion, that the district judge in St. Mary Parish had jurisdiction to decide this case and that his decision, that the penal clause in the statute under which the defendants were prosecuted is violative of the equal protection clause of the Fourteenth Amendment, is correct.